**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-CR-30003 |
| | ) | |
| PATRICK B. WALLACE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This matter comes before the Court for a Report and Recommendation on Defendant Patrick B. Wallace's Amended Motion for Hearing to Determine the Sufficiency of Affidavit Made to Obtain Search Warrant and to Quash Search Warrant and Evidence Seized Pursuant to the Same (d/e 26) (Motion).  Wallace is charged with one count of possession of 280 or more grams of crack cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).  Indictment (d/e 13). On December 15, 2011, law enforcement officers executed a search warrant (Warrant) at Wallace's residence located at 700 North 14th Street, Springfield, Illinois (Residence), and found cocaine and other evidence that forms the basis of the charge.  Wallace moves to suppress the drugs and other evidence found during the search because he claims that the affidavit

(Affidavit) used to secure the Warrant was materially false and was made in reckless disregard of the truth.

The Court conducted a limited evidentiary hearing on June 13, 2012. Wallace appeared personally at the hearing and by his attorney John Alvarez. The Government appeared by Assistant United States Attorney Timothy Bass. The Court further required the affiant of the Affidavit, Springfield Police Detective Tom Bonnett, to appear. See Notice of Hearing entered May 31, 2012.

The Court ordered the hearing to clarify information contained in the affidavit of Andrew Wallace submitted by Wallace in support of the Motion. Andrew Wallace acted as the Confidential Source (CS) for the Government during the investigation of Defendant Wallace.[1] The CS did not appear at the hearing, although both parties attempted to secure the CS's voluntary attendance. The Court held a status conference on June 11, 2012, during which the Court discussed the possibility of either party requesting a material witness warrant, but neither party requested such a warrant. See Minute Entry entered June 11, 2012.

After careful consideration of the parties' filings, the evidence submitted at the hearing, and the arguments of counsel, the Court finds

---

[1] The Court refers to Andrew Wallace as CS throughout the remainder of this Report and Recommendation.

that Detective Bonnett neither made a false statement in the Affidavit nor made a statement in reckless disregard of the truth therein.  The Court further finds that the Affidavit supported the State Court Judge's finding of probable cause to support the issuance of the Warrant.  The Court, therefore, recommends that the Motion should be DENIED.

## STATEMENT OF FACTS[2]

Detective Bonnett testified at the hearing.  Bonnett stated that he was currently on assignment to the Drug Enforcement Agency (DEA) Drug Task Force.  Bonnett testified that on December 2, 2011, he met with the CS and other law enforcement officers at the Springfield, Illinois, offices of the DEA.  A DEA agent from St. Louis, Missouri, brought the CS to the meeting.  The CS had assisted the DEA in the past in the St. Louis area.  The St. Louis DEA agent provided no negative information about his experience with working with the CS.  Bonnett and the agents ran a criminal history check of the CS.  The check revealed that the CS had a prior felony conviction.  At the hearing, Bonnett could not remember the particular offense of conviction.

At the December 2, 2011, meeting, the CS told the officers that Wallace lived at the Residence.  The CS stated that he had seen cocaine and currency at the Residence in the past.  The CS stated that Wallace

_____

[2]This Report and Recommendation is prepared without the benefit of a transcript.

drove a maroon Buick and a tan SUV.  The CS stated that Wallace had

surveillance cameras set up on the exterior of the Residence.   The CS

further told the officers that he was related to Wallace.   The CS stated that

he was upset at Wallace.  Bonnett testified that the family relationship was

not a concern; Bonnett had past experience with individuals cooperating

with law enforcement investigations of their relatives.

Bonnett and the other law enforcement officers decided to use the

CS to conduct a controlled purchase of drugs from the Residence on

December 15, 2011.  The DEA paid the CS for his cooperation.  On

December 15, 2011, the CS met with Bonnett and another law enforcement

officers at the DEA office.  The officers searched the CS's person and his

vehicle and determined that the CS had neither money nor drugs on his

person or in his vehicle.  The officers gave the CS $1,250.00 in official

funds to conduct the controlled buy.  The officers concealed on the CS's

person audio and video recording devices.  The officers turned the devices

on and started the recording at approximately 12:11 p.m.

The Government admitted into evidence Government's Exhibit #2,

the audiovisual recording made by the devices during the controlled buy.

The Court has reviewed the recording carefully.  The video shows a limited

view of matters in front of the CS.  The camera was apparently placed in

the center of the CS's chest.  The audio is sometimes garbled and difficult to understand.

The CS left the DEA offices in his vehicle and drove to the Residence.  Bonnett and other officers followed the CS to confirm that he drove to Wallace's residence without stopping.  The recording shows that the CS did not stop before arriving at the Residence.  Two other officers were already conducting surveillance of the Residence from across the street.  Bonnett parked about a block away from the Residence.  Bonnett monitored the recording devices from this location.  The law enforcement officers involved in the operation stayed in contact with each other by radio.

The recording shows that the CS parked in Wallace's driveway at approximately 12:28 p.m.  The CS spoke to woman briefly before he left the vehicle.  The sound of the woman's voice indicates that she was several feet away from the vehicle.  The video does not show the woman. The woman apparently asked the CS why he was there.  The recording is hard to understand, but the CS appears to have said that he came to see the "nigger."  Wallace and the CS are both African American men.

The CS then exited the vehicle.  The video shows a tan or gold colored SUV parked in the driveway.  The driveway is wide enough to allow two rows of cars to park side by side.  The driveway extends from the street past the Residence to the back yard of the Residence.  The CS

parked on the side of the driveway next to the front yard.  The CS also pulled up into the driveway near the porch.   The tan or gold SUV was parked on the other side of the driveway away from the front yard.  The SUV was not pulled up into the driveway as far as the CS's vehicle, but was closer to the street.

The front yard of the Residence had a low, decorative white picket fence around it with an opening in the center of the front of the yard.  A walkway led from the opening in the fence to the front door.  As the CS walked around to entrance in the fence at the front walkway, he asked the woman to call into the Residence for him.  The recording does not indicate whether she did so, or what happened to her thereafter.

The CS then walked to the front door of the Residence.  The video shows that house had a small front porch and a security-type screen door in front of the front door.  The security door had vertical metal rods and metal screening.  The CS knocked on the door and called out into the house.  The person inside seemed reluctant to let in  the CS.  The person inside said something to the effect that he did not want to see the CS right now or that he was not in the mood right now.  The CS, however, was admitted into the Residence and stayed approximately ten minutes.

The Court could not discern much from the video of the interior of the Residence because the interior generally was quite dark.  The audio is also

difficult to understand.  The other person in the Residence said something about an event at 3:00 p.m.  The other person also said something about hanging around for a couple of hours.  He seemed to be saying that the CS could wait if he wanted to do so.  There is also a discussion about money.  About five minutes after the CS entered the Residence, the voices of one or two other men can be heard on the audio recording.  The men conversed with the CS and each other, but the Court could not discern much of the substance of the conversation.

The video shows that the CS then left the residence at approximately 12:40 p.m.  The video shows a man entering the residence as the CS left.  The audio records the voices of two men at the entrance of the Residence as the CS left.  The CS had a brief conversation with the men as he left.  The substance of the conversation is not discernable.

The CS walked to his car. The video shows that the CS had parked his vehicle behind a sedan.  The tan or gold SUV was not present when the CS left the Residence.  Instead, a different vehicle is parked on that side of the driveway.  This vehicle was an SUV or a truck with a shell covering the truck bed.  This vehicle was pulled up into the driveway past the CS's vehicle farther away from the street.

As the CS approached his car, he turned around and walked back to the Residence.  The CS knocked and called into the Residence asking for

his car keys.  The CS had left his keys in the Residence.  The CS went back into the Residence, retrieved his keys, and returned to his vehicle.

The CS left and drove to the DEA office.  Shortly after the CS started driving he made a telephone call to someone.  The CS stated in the conversation that "it was a little bit under," that they weighed it, but the CS got it anyway.  The CS also stated that "he only got one," and that he would only have one until "2 or 3 o'clock."  The CS said he was on his way there and ended the call.  The CS arrived at the DEA office at approximately 12:58 p.m., at which time a law enforcement officer ended the recording.

Bonnett testified that when the CS returned to the DEA office, law enforcement officers again searched the CS's person and his vehicle.  The CS had a white substance that tested positive for cocaine.  The CS no longer had the money that the officers provided him.  The CS stated that Wallace sold him the white substance and that the white substance was crack cocaine.  The CS also stated that Wallace was expecting a large shipment of cocaine later in the day.  Bonnett was also informed that the Springfield Police Department Crimestoppers hot line received a tip that a person named PJ Wallace was bringing a shipment of cocaine to Springfield that day.  The tipster stated that Wallace lived on 14th Street and drove a maroon Buick and a Denali.

Bonnett then prepared the Affidavit to support an application for the Warrant to search the Residence.  Bonnett reviewed the recording (Government's Exhibit #2) before he prepared the Affidavit.  Bonnett based the information in the Affidavit on the recording, the December 2, 2011 interview of the CS, his personal observations of December 15, 2011, information provided from the other officers who participated in the controlled buy of December 15, 2011, and the Crimestoppers tip.   Bonnett and the other law enforcement officers had confirmed information from the CS, being:  the existence of the security cameras on the exterior of the Residence, that Wallace owned a maroon Buick, and that the Buick was present at the Residence at the time of the controlled buy.  The Affidavit stated, in part,

> I am familiar with the below listed facts based on my own personal investigation, the investigation of other law enforcement officers, or information officially furnished to me by other law enforcement officers, witnesses, or confidential sources.  On 12/15/11, TFO [Task Force Officer] Tom Bonnett along with officers from the Springfield Police Department (SPD) and Illinois State Police/Central Illinois Enforcement Group [CIEG] met with a Confidential source (CS) at a predetermined location (PAL).  TFO Bonnett and other agents conducted an operation of a control drug buy utilizing a CS from Patrick WALLACE at 700 North 14th Street in Springfield.

> During a debriefing of the CS about WALLACE before the operation the CS stated that WALLACE has surveillance cameras all around the residence and are contacted to a big screen TV in the living room and also in the bedroom.  The CS stated the CS had observed three handguns inside the

residence within the past 4 weeks.  The CS stated WALLACE drives a maroon colored Buick and a tan colored SUV. CS did not know the plates numbers for the vehicles.  TFO Bonnett searched the CS for contraband with negative results.  SPD Officers Russ Lehr and Brian Graves searched the CS's vehicle for contraband with negative results.

TFO Bonnett provided the CS with $1,250.00 of Official Advanced Funds (OAF) to use for the drug buy.  Agents from the DEA Springfield office, SPD and CIEG set up surveillance on 700 North 14th Street.  SPD Officers Lehr and Graves followed the CS from the PAL directly to 700 North 14th Street without stopping anywhere in between.

SPD Officer Jeremy Oldman observed the CS to arrive at this residence.  SPD Oldman observed the CS to exit the CS's vehicle and walk up to the front door of this residence.  DEA TFO Tim Hansen observed the CS to walk into the residence.

Approximately 10 minutes later TFO Hansen observed the CS to exit the residence then walk back into the residence without contacting anyone.  Approximately 2 minutes later TFO Hansen observed the CS to exit the residence and walk back to the CS's vehicle.  The CS drove out of the area followed by SPD Officers Lehr and Graves. The CS was followed back to the PAL.

SPD Officers Lehr and Graves searched the CS's vehicle for contraband with negative results.  TFO Bonnett and CIEG Terry Day met with the CS and at this time the CS handed CIEG Day a plastic baggie that contained a white chucky substance purported to be crack cocaine. CIEG Day field tested the chucky substance with positive results for the presence of cocaine.  TFO Bonnett searched the CS for contraband with negative results.

The CS stated when the CS arrived at the residence the CS made contact with Patrick WALLACE inside the residence.  The CS stated the CS handed WALLACE the $1250.00 OAF in exchange for the plastic baggie containing the purported crack cocaine.  The CS observed approximately 10 other plastic

baggies the same size that contained suspected crack cocaine inside the residence.  The CS stated WALLACE told the CS that he was going to obtain a large amount of drugs around 3:00 pm today and for the CS to return to buy more.  During the time of the controlled drug buy Officer Lehr was contacted by Crimestoppers in reference to a drug tip that they had just received.  The tipster stated that PJ WALLACE is coming off I-55 today with a load of cocaine but did not know what time. The tipster stated WALLACE lives on North 14th Street by Concordia and drives a tan colored Denali with plate number N2999908 and a darkmaroon colored Buick Lacerine. A LEADS check for the plate number "N2999908" shows error because of to many numbers.

TFO Bonnett knows WALLACE to drive a maroon colored Buick with plate number "L8459551" and was present in the driveway at 700 North 14th Street at the time of the operation on today's date.  A LEADS check of this plate number shows WALLACE to be the owner of this vehicle.

A check of WALLACE's prior criminal history shows WALLACE to have federal drug conviction for conspiracy to distribute cocaine and on Federal Parole until 2013.

Surveillance conducted today on the residence of 700 North 14th Street found WALLACE to have surveillance cameras around the residence and the front door of the residence having a black colored security storm door.

Motion, Exhibit A, Affidavit.

Bonnett presented the application for the warrant to search the

Residence to an Illinois Associate Circuit Judge, along with the Affidavit.

Based upon the information in the Affidavit, the Judge issued the Warrant.

The Warrant was executed at approximately 10:52 p.m. on December 15,

2011.  The officers found suspected cocaine, currency, firearms, and other

evidence of drug distribution.  <u>Government's Response to Defendant's</u>

<u>Motion to Suppress (d/e 26)</u>, attached <u>Return of Search Warrant</u>.

On April 1, 2012, the CS executed an affidavit in which stated, in part,

[O]n or about December 1st 2011, I fabricated a story on Patrick Wallace, claiming that he was in fact a drug dealer.  I was sent to a address where Patrick was located to purchase a ounce of crack.  When I pulled up into drive I was met by an associate who was in a gold Cherokee who sold me a once of crack threw my passenger window then I went into the resident and Patrick stated he didn't have no crack when asked.  Weeks before me and Patrick had a fallen out so I hated him.  But when I was called back by D.E.A. that night they made it clear that they wanted Patrick, and I was afraid because they came on strong I thought if I told the truth I would have these guys after me, also I was guaranteed money to produce drugs.  So I took it upon myself to try to get Patrick on tape selling drugs I could never get Patrick on video giving me drugs.  On the day of December 15th it was my hope that no one would script search me before entering the residence.  It's my hope that this letter would clear my conscience, I was in a situation where I thought I was in control, but it got out of hand.

<u>Motion</u>, Exhibit B, <u>Affidavit of CS</u>.

Counsel for Wallace asked Bonnett at the hearing whether two

individuals, Wallace's daughter Dominique Brown and a man named Joe

Brown, came up to the CS's vehicle after the CS arrived at the Residence,

but before the CS exited the vehicle.  Bonnett said no.  The Court's review

of the audiovisual recording contains no indication that any person came

up to the CS's vehicle at this time, or that the CS had any contact with

anyone near CS's vehicle at this time.  The recording only reflects that the

CS had the conversation with the woman noted above who was standing some distance from the CS's vehicle. Upon questioning by the Government, Bonnett testified that he had no indication that anyone approached the vehicle during the controlled buy. Bonnett further stated that nothing caused Bonnett to doubt the CS's veracity or to indicate that the CS bought cocaine from anyone in a gold Cherokee.

Wallace then called Sandra Johnson to the stand. Before Johnson took the stand, the Court noted that Johnson was initially named as a co-defendant in the criminal complaint filed in this case. Complaint (d/e 1). Counsel for the Government stated that representative of his office were currently involved in discussions with Johnson and her counsel. Johnson's counsel was not present at the hearing. The Court directed Johnson to leave the courtroom and attempt to contact her counsel.

Counsel for Wallace stated that he thought that the charges against Johnson had been dropped and the case against her had been closed. Wallace then offered a proffer in lieu of Johnson's testimony. Counsel proffered that Johnson would testify that she was the woman standing in front of the Residence with whom the CS had the brief conversation when he arrived at the Residence. Counsel for Wallace proffered further that Johnson would testify that she saw Dominique Brown and a man approach the CS's car after the CS parked at the Residence, but before he exited the

vehicle. Counsel proffered that Johnson would testify that she did not see whether any transaction occurred between the CS and did not hear the substance of any conversation between the CS and the two individuals.

The Government also submitted into evidence during the hearing the DEA agent reports related to the investigation (Government's Exhibit #1) and an audiovisual recording of a second controlled buy conducted at the Residence later on December 15, 2011 (Government's Exhibit #3). The second controlled buy occurred after the State Court Judge had issued the Warrant. The DEA reports were written after the execution of the Warrant. The Court admitted the reports without objection. The Court admitted the video (Government's Exhibit #3) over Defendant's objection, but stated that the Court would later determine the weight to give the recording. The Court has considered the matter and determined that the reports and the recording of the second buy have very little relevance to the issues before the Court. Neither existed when Bonnett prepared the Affidavit or when the State Court Judge issued the Warrant. The Court, therefore, has not reviewed the recording (Government's Exhibit #3) nor the reports (Government's Exhibit #1) and has not considered this evidence in making this Report and Recommendation.

The Fourth Amendment protects individuals from unreasonable searches and seizures.  Generally, searches and seizures must be conducted pursuant to a warrant issued by a neutral magistrate upon on a showing of probable cause.  Illinois v. McArthur, 531 U.S. 326, 330 (2001).  In this case, Bonnett presented the Affidavit to the State Court Judge, and that Judge found probable cause and issued the Warrant.  The Affidavit submitted to support the complaint for the Warrant is presumed to be valid.  United States v. Johnson, 580 F.3d 666, 670 (7th Cir. 2009).  Once the Judge issued the Warrant, Bonnett and the other officers are presumed to have acted in good faith in executing the Warrant.  To overcome these presumptions, Wallace must prove that the Warrant was so lacking in probable cause that Bonnett's belief in the existence of probable cause was unreasonable or that Bonnett acted dishonestly or recklessly in preparing the Affidavit.  United States v. Mitten, 592 F.3d 767, 771 (7th Cir. 2010).[3]  Wallace puts great weight on the CS's affidavit and its "retraction" of facts against Wallace.  However, Wallace cannot overcome the presumption regarding the Affidavit in support of the Search Warrant by merely presenting evidence that the CS lied to Bonnett.  Rather, Wallace

---

[3]Wallace may also overcome the presumption by proving that the Judge abandoned his role as a detached and neutral magistrate.  Johnson, 580 F.3d at 670.  Wallace does not raise any challenge to the neutrality of the Judge.

must prove, "that the officer submitting the complaint perjured himself or acted recklessly because he seriously doubted or had obvious reason to doubt the truth of the allegations." <u>Johnson</u>, 580 F.3d at 670.[4]

Wallace presents no evidence that Bonnett knew or had reason to believe that the Affidavit was false or that the CS was lying. Bonnett corroborated the prior information from the CS that Wallace owned a maroon Buick and that there were security cameras on the exterior of the Residence. On December 15, 2011, Bonnett knew that the CS had no drugs or money other than the money that the officers provided to him when the CS left the DEA offices. Bonnett and other officers followed the CS along to confirm that the CS went to the Residence. Bonnett monitored the recording devices and maintained radio contact with the other officers involved in the operation while the CS was in the Residence. Bonnett and other officers followed the CS back to the DEA offices. Bonnett met with the CS after he arrived. Bonnett knew that when the CS returned to the DEA, he produced the white substance that tested positive for cocaine. Bonnett knew that the CS stated that he bought the cocaine from Wallace at the Residence and that Wallace was expecting a big shipment of

---

[4]The reason the Court allowed a limited evidentiary hearing was to see if "<u>any</u>" law enforcement information existed, recorded or otherwise, that would support or negate the allegations in the CS's affidavit and his "retraction" of evidence concerning Wallace. The evidence introduced at the hearing actually negated the CS' retraction and negated any recklessness on behalf of Affiant Bonnett.

cocaine later that day.  The Crimestoppers tip was consistent with the CS's information.  Bonnett also reviewed the audiovisual recording (Government's Exhibit #2) which confirmed the information provided by the CS and the other officers involved in the operation before the affidavit was prepared.  The Court finds no basis to support the contention that Bonnett either knew that the CS lied, or that Bonnett acted recklessly in believing the CS.

Wallace argues that the Affidavit is false because Bonnet did not mention either that: (1) Dominique Brown and Joe Brown came up to the CS's vehicle when the CS arrived at the Residence; or (2) Brown interacted with a person in a gold Cherokee vehicle when arrived at the Residence. The only evidence of these two events are the CS's affidavit and the proffer of Johnson's testimony.  These two pieces of evidence lack credibility.  The two pieces of evidence are inconsistent:  the proffer of Johnson indicates that two individuals walked up to the CS's vehicle; however, the CS's affidavit states that he dealt with a person who was inside a gold Cherokee vehicle.  The two pieces of evidence are further contradicted by the audiovisual recording (Government's Exhibit #2).  The recording gives no indication that anyone was near the vehicle when the CS arrived or that the CS interacted with anyone near his vehicle or in another vehicle. The recording only reflects the brief conversation with the woman who was

standing some distance from the CS's vehicle. Finally, Wallace presents no evidence that any of the officers watching the Residence saw either of these alleged events. The Court finds that this evidence is not credible.

Beyond the lack of credible evidence, Wallace presents no evidence that Bonnett had any reason to believe that anyone walked next to the CS's vehicle when he arrived that the Residence or that the CS bought drugs from a person in a gold Cherokee. The issue is whether Bonnett lied or acted recklessly, not whether the CS lied. Bonnett testified that the Affidavit accurately reflected the information he personally observed and that he received from viewing the recording, from the CS and from the other officers involved in the operation. Wallace presents no evidence to the contrary. The CS did not tell Bonnett about anyone coming up to the vehicle or about a transaction with a person in a Cherokee. The audiovisual recording did not indicate that either of these events occurred. Bonnett further testified that he had no reason to believe that the CS bought any drugs from a person in a gold Cherokee, nor from anyone outside the Residence. Wallace presents no evidence that Bonnett either lied or acted recklessly in omitting these "alleged" interactions from the search warrant Affidavit.

Wallace also notes that the Affidavit does not mention either the CS's conversation with the woman when he arrived at the Residence or the CS's

conversation with the two men who arrived at the Residence as the CS was leaving the Residence. The omission of these two events is not material. The fact that the CS said a few words to these people as he was coming and going is not significant. Bonnett testified that the CS had no physical contact with these individuals, and so, had no opportunity to receive drugs from them. Wallace also agrees that neither the woman nor the two men at the door transferred the cocaine, or anything else, to the CS. The omission of these two minor interactions from the Affidavit did not render the Affidavit materially false.

Wallace argues that the Affidavit falsely states that officers observed the CS "exit the residence then walk back into the residence without contacting anyone." Wallace argues that the CS contacted the two men who arrived as he was leaving. The Court disagrees. The quoted statement is consistent with the Affidavit that set forth the fact that the CS walked from the Residence to his vehicle and then walked back to the Residence when he realized he left his keys in the Residence. The CS did not contact anyone during the walk to and from his vehicle. Furthermore, Bonnett clarified that he meant physical contact when he used the phrase "without contacting anyone." The fact that two men entered that home as the CS left is not material. The claimed inaccurate statement about not

contacting anyone while walking from the Residence to the car and back does not demonstrate recklessness of affiant Bonnett.

Wallace also argues that the Affidavit is false because Bonnett did not disclose that the CS was a relative of Wallace or that the DEA paid the CS for his cooperation. The Court again disagrees. The issue is whether Bonnett made materially false statements in the Affidavit either intentionally or in reckless disregard of the truth. <u>Johnson</u>, 580 F.3d at 670. The omission of these facts from the Affidavit did not render the Affidavit, or any statement therein, either false or misleading. <u>See</u> <u>United States v. McNeese</u>, 901 F.2d 585, 594 (7th Cir. 1990). Wallace fails to overcome the presumption that Bonnett made the Affidavit in good faith.

Wallace finally argues that evidence should be suppressed because the Affidavit failed to establish probable cause to support the issuance of the Warrant. Once the State Court Judge issued the Warrant, Bonnett and the other officers are presumed to have acted in good faith in executing the Warrant. To overcome this presumption, Wallace must prove that the Warrant was so lacking in probable cause that the officers' belief in the existence of probable cause was unreasonable. <u>Mitten</u>, 592 F.3d at 771.

An affidavit in support of a warrant establishes probable cause if it "sets forth facts sufficient to induce a reasonable prudent person to believe that a search thereof will uncover evidence of a crime." <u>McNeese</u>, 901

F.2d at 592.  The State Court Judge's finding of probable cause "should be

paid great deference."  <u>Illinois v. Gates</u>, 462 U.S.213, 236 (1983).  The

Supreme Court explained in <u>Gates</u>,

> "A grudging or negative attitude by reviewing courts toward
> warrants," is inconsistent with the Fourth Amendment's strong
> preference for searches conducted pursuant to a warrant
> "courts should not invalidate . . . warrant[s] by interpreting
> affidavit[s] in a hypertechnical, rather than a commonsense,
> manner."

<u>Id.</u> (quoting <u>United States v. Ventresca</u>, 380 U.S. 102, 745 (1995) (citations

omitted)(ellipses and brackets in original quotation).

When read in this light, the Affidavit clearly established probable cause.

The officers confirmed the CS's statements that Wallace drove a maroon

Buick and had security cameras at the Residence.  The officers searched CS

and his car was searched before he went to the Residence to conduct the

controlled buy.  The officers provided $1,250.00 to make the controlled buy.

The officers kept the CS under surveillance from the time he left the DEA

offices until he returned.  The only place the CS went was the Residence.

When he returned, the CS had cocaine, but no money.  The CS stated that

he bought the cocaine at the Residence from Wallace.  The CS stated that

Wallace told him that he would receive a large shipment of cocaine later in

the day.  The Crimestoppers tip was consistent with this statement.  The

Crimestoppers tip also stated that Wallace lived on 14th Street and that

Wallace owned a maroon Buick. All of this information provided ample evidence to "induce a reasonable prudent person to believe that a search thereof will uncover evidence of a crime." <u>McNeese</u>, 901 F.2d at 592. The Warrant was valid. Wallace's arguments to the contrary are not persuasive.

WHEREFORE, this Court recommends that Defendant Patrick B. Wallace's Amended Motion for Hearing to Determine the Sufficiency of Affidavit Made to Obtain Search Warrant and to Quash Search Warrant and Evidence Seized Pursuant to the Same (d/e 26) (Motion) should be DENIED. Wallace's original Motion for Hearing to Determine the Sufficiency of Affidavit Made to Obtain Search Warrant and the Sufficiency of the Resulting Search Warrant (d/e 18) should also be DENIED as moot as it was replaced by the more detailed Motion (d/e 26).

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after being served with ECF copy of this Report and Recommendation. <u>See</u> 28 U.S.C. § 636(b)(1). Failure to file a timely objection will constitute a waiver of objections on appeal. <u>See</u> <u>Video Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538, 539 (7th Cir. 1986); <u>Local Rule</u> 72.2.

ENTER:    June18, 2012

*<u>s/ Byron G. Cudmore</u>*
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE
